2003 OK 24

**Edward MACSUGA, an individual d/b/a Eddie Mack Auto Service, Petitioner/Appellant,**

v.

**Johnny MORENO and The Workers' Compensation Court, Respondents/Appellees.**

No. 89,432.

Supreme Court of Oklahoma.

March 11, 2003.

---

Clifford R. Magee, Tulsa, OK, for Petitioner.

William J. Anton, Tulsa, OK, for Respondents.

HARGRAVE, J.

¶ 1 Appeal arising from Court of Civil Appeals *de novo* review of a Workers' Compensation Court finding of jurisdiction in a case finding the existence of an employment contract.

## SUMMARY OF FACTS AND PROCEDURAL HISTORY

¶ 2 Edward Macsuga owned an automobile garage from which he operated a number of

taxi cabs. Macsuga's house was attached to the shop. Moreno, the claimant, and at least one other man lived at Macsuga's house rent-free, in exchange for doing odd jobs from time to time. Moreno was free to come and go at his leisure and did not punch a time clock, did not wear a uniform, did not have an employee manual, received no wages, and filed no income tax returns. He had no set working hours, and sometimes would just hang around the shop with the guys, watching television and drinking beer. On December 20, 1994, Moreno injured his eye while attempting to remove a tire. Emergency room records reflect that Moreno was identified as an unemployed person who received treatment for a non-work related, non-accidental injury. The record shows that Moreno had been drinking before going to the emergency room. Moreno allegedly told Macsuga that he had been hurt in a bar fight. After the incident, Moreno continued to live at Macsuga's house with the same informal, odd-job arrangement at the garage. He eventually lost the eye.

¶ 3 In June of 1996, Moreno moved out of Macsuga's house. He had been given an ultimatum to either get out, or get treatment for his alleged drinking problem. Shortly after leaving Macsuga's house, on July 3, 1996, Moreno filed this workers' compensation proceeding, claiming work-related injury to his eye. On this evidence, the majority of the Court of Civil Appeals concluded that the Workers' Compensation Court correctly found the existence of an employment relationship, and an injury arose out of and in the course of this relationship. Macsuga appeals arguing that the Court of Civil Appeals erred by failing to properly apply a *de novo* review to the evidence presented in this case.

## EMPLOYMENT CONTRACTS

¶ 4 This Court has held:

When the existence of the employer-employee relationship is an issue before the Workers' Compensation Court, a jurisdictional question is presented and the Supreme Court on review will not accept findings of the court as conclusive, but will weigh evidence contained in the record and independently evaluate law and facts to determine the existence or absence of the relationship.

*Cherokee Lines, Inc. v. Bailey,* 1993 OK 111, ¶ 1, 859 P.2d 1106, *Beall v. Altus Public School Dist.,* 1981 OK 93, ¶ 3, 632 P.2d 400, 401. See also *Osmus v. City of Oklahoma City,* 1977 OK 88, 568 P.2d 1259, and *Brewer v. Bama Pie, Inc.,* 1964 OK 58, 390 P.2d 500.

¶ 5 Although the Workers' Compensation Act is to be construed liberally in favor of workers it is intended to benefit, Moreno must be held to strict proof that he was an employee of Macsuga's in order to be covered by the provisions of the Act. *Cherokee Lines, Inc., v. Bailey,* 1993 OK 111, ¶ 13, 859 P.2d 1106, *Beall v. Altus Public School Dist.,* 1981 OK 93, ¶ 11, 632 P.2d at 403. An employer-employee relationship "is created by contract, either express or implied, or by the unequivocal acts of the parties recognizing the relationship." *Beall,* ¶ 8 (quoting *Landrum v. Ownby,* 290 P.2d 400 (Okla. 1955)).

¶ 6 This is a matter where a jurisdictional question is presented. If there exists a valid employer-employee relationship, the Workers' Compensation Court has jurisdiction. This Court, in such matters, does not accept findings of the Workers' Compensation Court as conclusive, but we weigh the evidence contained in the record and independently evaluate law and facts to determine the existence or absence of the relationship. In doing this *de novo* review, we give no deference to the finding below. We have held:

Under this standard—rather than accept the fact findings of the Workers' Compensation Court as conclusive—we review the entire record, weigh the evidence, and make independent fact findings without deference to the fact findings or to the legal rulings made by the compensation court. The question of whether an employer-employee relationship exists has long been recognized as a jurisdictional fact question subject to independent review.

*Garrison v. Bechtel Corp.* 1995 OK 2, ¶ 8, 889 P.2d at 277.

In the present matter, we find that the Workers' Compensation Court did in fact have jurisdiction as Moreno has proven that there was an employer-employee relationship.

## EVIDENCE SUPPORTING THE EXISTENCE OF AN EMPLOYER–EMPLOYEE RELATIONSHIP

¶ 7 Petitioner testified that he had known Macsuga for ten years and had lived in his house for three years. Moreno testified that in exchange for living in the house he worked on cars owned by Macsuga. These cars were used for taxis and Moreno testified that he and Macsuga kept the cars in working order and that he helped prepare the cars for inspection. Moreno's alleged duties included: performing brake jobs; changing water pumps; changing spark plugs; changing tires; transmission repairs; drive shaft work; and some body work. He testified that when a car came in broken down, he would try to fix it. He used Macsuga's tools to do this work. Moreno also testified that he was not able to do air conditioning work or carburetor work, and that such work was performed by Macsuga. Moreno testified that his job also included cleaning the garage.

¶ 8 Moreno also testified that he did take other jobs occasionally. These jobs included lawn mowing and roofing work. Moreno was free to come and go at his leisure and did not punch a time clock, did not wear a uniform, did not have an employee manual, received no wages, and filed no income tax returns. He had no set working hours, and sometimes would just hang around the shop with the guys, watching television and drinking beer. Moreno never received a W–2 or 1099 form from Macsuga.

¶ 9 Moreno testified that on December 20, 1994, he and his roommate, Gary Taylor, a man with a similar arrangement with Macsuga, were in the process of disposing of tires from the Macsuga's property. The City of Tulsa requested that the tires be removed. Moreno testified that at the time of his injury he was removing a tire from a rim. This tire and rim did not fit on the tire machine, so he was attempting to remove it by hand. In attempting to remove the tire, the tire tool slipped and hit Moreno injuring his left eye. Later that night, Gary Taylor took Moreno to the emergency room where Moreno testified that he was in such pain that he did not remember anyone asking him any questions. He further testified that he was immediately escorted to an examination room when he reached the hospital. His eye was ultimately removed and Moreno now wears a glass eye.

¶ 10 Macsuga testified that prior to allowing Moreno to live in his house, Moreno told him had been living with some men involved in narcotics and he wanted to get out of that situation. Macsuga testified that he allowed Moreno to move into the house rent free and expected him to do no labor. He testified that there was no employment contract between them and that to his knowledge, Moreno never worked on any of his cars. He just allowed Moreno to live in the house rent free and even occasionally gave Moreno a few dollars. Macsuga also testified that Moreno mowed the lawn and did yard work around the house. Macsuga testified that he never filed a W–2 or 1099 for Moreno.

¶ 11 Macsuga testified that he also allowed Gary Taylor to live in the house. He said he let him live there for nothing, but let him run his upholstery business out of the shop. He testified that in return for allowing Gary to run his business out of his shop, Gary would do upholstery work on his cabs free of charge. Macsuga stated that living in the house was not part of the deal, he just let Gary live there for free, not expecting anything in exchange.

¶ 12 Macsuga testified that Moreno told him of his injury the day it occurred, but that Moreno gave conflicting stories about how his eye was injured. He testified that Moreno told him that some guy beat him up in a bar fight and then he told him that he had injured his eye working on Gary's tire. Macsuga testified that Moreno told him it was Gary's tire and wheel that Gary had discarded and that Moreno was trying to salvage the wheel. Macsuga testified that the wheel was not his.

¶ 13 Moreno testified that he never worked on Gary's car and that Gary did all such work himself. He further testified that the

tire was one of many around the shop and that he had no idea whose tire it was. He doubted if it was Gary's as Gary had previously sold his car. Moreno also testified that he never told Macsuga that he hurt his eye in a bar fight.

## ANALYSIS OF TESTIMONY

¶ 14 We find that the foregoing testimony does show that there existed an employer-employee relationship. Although Macsuga denied any type of employer relationship at trial, it is apparent that Moreno did in fact work for him at least part-time. From Macsuga's own testimony when asked about Gary Taylor, he admitted that an arrangement existed that required Gary to do some work on his vehicles. Apparently Taylor could also do work for others, but part of his requirements to Macsuga involved upholstery work.

¶ 15 Moreno was also allowed to work for others. He did do roofing work and mowed lawns for Macsuga as well as others. Keeping Macsuga's small taxi fleet working was probably not a full time job in itself, but when Macsuga needed help, he had two workers very handy. He also testified that he occasionally gave Moreno small "loans" that he never expected to be repaid, as well as paid him to help him with a catering event. From this evidence, we determine that an employment contract existed between Macsuga and Moreno that provided Moreno with free room and partial board in exchange for part-time help around the shop.

¶ 16 At trial, and now on appeal, respondent makes issue of the form filled out at the hospital in conjunction with Moreno's treatment. This form purports to show that Mr. Moreno was not employed and that the injury was neither an accidental injury nor work-related injury, and that this information was garnered from Moreno. Moreno does not remember giving any such information. He testified that he was in too much pain. He testified that Gary might have given the information to the hospital. Macsuga makes much of this hospital admission form. To him, it is the smoking gun that disproves Moreno's claim of employment. We find it to be less persuasive.

¶ 17 This form was not filled out by Moreno and, in fact, it was a typed document. Moreno testified that he was immediately taken to an examination room upon his arrival in at the hospital. It is possible that Gary Taylor did supply some of the information to the nurse. Macsuga did not produce any witnesses from the emergency room to testify on how the forms were completed normally, completed on this occasion, or to explain the form. Additionally, the report of the treating doctor shows that Moreno told her he hurt his eye working on a tire.

¶ 18 Additionally, we find Macsuga's argument that he lets people live in the house for free to be disingenuous. As with his other tenant, Gary Taylor, he was receiving a benefit by allowing Mr. Taylor to live in his house. Taylor was an upholsterer, and he did upholstery work on Macsuga's cars. Macsuga also testified that Gary answered the phone for him at times. From the record, it appears that Macsuga runs his taxi cab leasing company by hiring his workers for room and partial board. He received the work of two employees and only paid them room and partial board. Even if he didn't use their labor on a full time basis, allowing them to do other occasional jobs, he had them on premises at any time to work.

## IMPLIED ORAL CONTACT

¶ 19 While Moreno's testimony points to the existence of an express oral employment contract, denied by Macsuga, it is also obvious that an implied-in-fact contract existed. The existence and terms of an implied contract are manifested by conduct. 15 O.S. 1991, § 133. "Implied contracts exist where the intention of the parties is not expressed, but the agreement creating the obligation is implied or presumed from their acts, where there are circumstances that show a mutual intent to contract." *Jones v. University of Central Oklahoma*, 1995 OK 138, ¶ 7, 910 P.2d 987.

¶ 20 From the record, it is apparent that there was a mutual intent to contract in the present case. Moreno was to help out around the shop and in return, Macsuga provided Moreno with a place to live. More-

no did acts around the house and shop that evidenced required duties and, in return, Macsuga allowed him to live in the house, paid all utilities and even loaned Moreno money and allowed him to use his lawn mower to mow other peoples yard.

## AVERAGE WEEKLY WAGE

¶ 21 The order set Moreno's benefits based upon an average weekly wage of $300.00, the amount alleged in Moreno's Form 3. Macsuga argued that this finding is not supported by competent evidence. We agree. The record is devoid of evidence of the value of the room and board received by Moreno in return for his work on Macsuga's taxi cabs and around the shop. Without such evidence, the Workers' Compensation Court could not set the weekly wage. The portion of the order determining the amount of Moreno's benefit for temporary total disability and permanent partial disability must be vacated, and the case remanded for entry of an order based upon appropriate evidence.

**CERTIORARI PREVIOUSLY GRANTED; COURT OF CIVIL APPEALS OPINION VACATED; ORDER OF THE WORKERS' COMPENSATION COURT SUSTAINED IN PART, VACATED IN PART AND REMANDED**

¶ 22 WATT, C.J., OPALA, V.C.J., HODGES, LAVENDER, KAUGER, BOUDREAU, WINCHESTER, JJ., CONCUR.

¶ 23 SUMMERS, J., DISSENTS.